UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ERIC BIRTHWRIGHT,

Petitioner,

v.

STEPHEN JOHNSON,

Respondent.

Civil Action No. 18-14019 (SDW)

OPINION

**WIGENTON,** District Judge:

Presently before the Court is the amended petition for a writ of habeas corpus of Eric Birthwright ("Petitioner") brought pursuant to 28 U.S.C. § 2254 challenging his state court convictions. (ECF No. 6). Following an order to answer, Respondents filed an answer to the amended petition (ECF No. 14). Petitioner did not file a reply. For the following reasons, the Court will deny Petitioner's amended habeas petition, and deny Petitioner a certificate of appealability.

**I. BACKGROUND**

In affirming Petitioner's conviction, the Superior Court of New Jersey – Appellate Division found that the "evidence of [Petitioner]'s guilt [presented at trial] was compelling" and summarized that evidence as follows:

> [Wiley] Kinman[, the victim in this matter] was a known drug dealer who sold drugs at Mravlag Manor in Elizabeth. Dihunat Williams testified he was involved in selling drugs with both Kinman and [Petitioner]. Kinman's arrangement with [Petitioner], who was also known as "Rue," was that Kinman provided [Petitioner] drugs to sell and expected a portion of the profits in return. [Petitioner] owed Kinman around $300 to $400 from money

1

he failed to return after selling drugs provided by Kinman. During the weeks leading up to Kinman's death, the money [Petitioner] owed to Kinman was a constant topic of conversation, which sometimes escalated into a heated argument and physical violence or threats of violence.

In the late afternoon of November 14, 2006, Kinman and [Petitioner] were involved in such an argument at Gail Williams' [("Gail")] apartment in Mravlag Manor. Kinman yelled at [Petitioner] that he wanted his money and referred to [Petitioner]'s past debts. Kinman told [Petitioner] he would see him later and that he was going to "jump [him] or fuck [him] up."

About five minutes later, [Petitioner] left the apartment with Larry Perkins, Kinman's cousin. As they were leaving, [Petitioner] said to Perkins, "I'm about to pop him or get him popped" and that he was going to call an individual named Bivot. Perkins went to downtown Elizabeth and [Petitioner] left with Bivot to go to another apartment in Mravlag Manor.

Kinman and Williams headed toward a nearby restaurant, Chicken Shack. While inside the restaurant, Williams received a phone call from [Petitioner] asking him where he was. Williams told [Petitioner] that he was at the restaurant. As Kinman and Williams left Chicken Shack, Kinman stopped to talk to some people, while Williams kept walking toward Mravlag Manor. Williams saw [Petitioner] walking toward him with a group of about three or four other people. As [Petitioner] passed him, Williams asked, "What's up, where you going?" [Petitioner] did not answer and kept walking. Seconds later, Williams heard three gunshots. Williams took off running toward his mother's house across the street. He did not turn around, but he knew the shots came from behind him. At his mother's house, Williams called Kinman's phone, but there was no answer.

Kinman was killed by three gunshot wounds to the head and neck, fired from behind. A bullet to the top of his head penetrated his skull but not his brain. Two other bullets delivered fatal wounds. One bullet entered his jawline, travelled through his throat and injured two major blood vessels in his neck before exiting. There was a second fatal wound that was instantly lethal, caused by a bullet that entered behind Kinman's left ear, travelled through the left lobe of the cerebellum and then the right lobe, partially transecting the brain stem.

Responding officers found three or four shell casings near Kinman's body. Two of the shell casings had sufficient identifying marks to indicate they were fired from the same firearm.

On the evening of the shooting, [Petitioner] called his half-sister, S.T., and asked her to come to Elizabeth from Trenton to pick him up. She said [Petitioner] sounded "anxious" but would not tell her what was wrong. She drove to Elizabeth with her housemate. [Petitioner] was quiet on the drive back to Trenton and said he would explain the reason for the big rush when they got there. After they arrived in Trenton, [Petitioner] told S.T., her housemate, and S.T.'s boyfriend, George Melvin, that "he just murdered somebody." Thinking he was kidding, they questioned him, but [Petitioner] repeated himself and "looked like he was being serious." When asked what happened, [Petitioner] said he had been arguing with a guy who threatened to smack him with a stick; that he went to get a gun and shot him. Later, [Petitioner] called S.T.'s housemate and told her that "he killed the guy because the guy kept coming at him."

At around 10 p.m. that evening, [Petitioner] had a phone conversation with J.H., whom he was dating, and told her Kinman had been shot. J.H. recalled that [Petitioner] sounded scared. In subsequent conversations, [Petitioner] told J.H. he loved her but knew she would be unwilling to "do jail time" with him. [Petitioner] also referred to J.H.'s cousin, a drug dealer who, like Kinman, wanted [Petitioner] to pay him money he owed. [Petitioner] told J.H. to tell her cousin that "it was [Petitioner's] work what happened in Mravlag Manor," which J.H. understood to mean that [Petitioner] killed Kinman.

Three days later, J.H. heard from [Petitioner] again. [Petitioner] said he shot Kinman after an argument in which Kinman threatened to beat his face in with a stick and that [Petitioner] "took the gun from his boy." He told J.H. about an earlier argument with Kinman and that the shooting happened across the street from Chicken Shack.

The day after the murder, [Petitioner] called Williams and said he knew that everybody was mad at him.

The jury convicted [Petitioner] on all charges [including murder, unlawful possession of a firearm, and possession of a firearm for an unlawful purpose]. He was sentenced to a fifty-year prison term with an eighty-five percent period of parole ineligibility on his conviction for first-degree murder, and concurrent sentences on the weapons offenses.

3

(Document 7 attached to ECF No. 14 at 2-6).

## II. DISCUSSION

### A. Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." The petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, --- U.S. ---, ---,132 S. Ct. 2148, 2151 (2012). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for the purposes of the statute where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, --- U.S. ---, ---, 125 S. Ct. 1372, 1376 (2015). "When

4

reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

**B. Analysis**

**1. Petitioner's jury instruction claims**

In his first series of arguments, Petitioner challenges various elements of the jury instructions issued in his case. Specifically, Petitioner challenges the refusal of the trial judge to charge the jury as to two lesser included charges – aggravated manslaughter and passion/provocation manslaughter – and challenges the sufficiency of the charge given by the trial judge as to conflicting statements given by witnesses, which Petitioner argues deviated critically from the state courts' model jury instruction on the issue. That a jury "instruction was allegedly incorrect under state law is not a basis for habeas relief." *Duncan v. Morton*, 256 F.3d 189, 203 (3d Cir.) (quoting *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991)), *cert. denied*, 534 U.S. 919 (2001). A petitioner can therefore only show his entitlement to habeas relief based on an allegedly insufficient or improper jury instruction where the petitioner proves that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). A reviewing court must therefore review a jury instruction in the context of the entire charge given by the trial court and in light of the whole of Petitioner's trial. *Duncan*, 256 F.3d at 203. That a challenged instruction was "undesirable, erroneous, or even universally condemned," is insufficient to warrant habeas relief, a petitioner

5

can only prevail on such a claim by showing that the instruction rendered her trial fundamentally unfair. *Id.*

Petitioner first contends that the trial court should have provided instructions as to two lesser included charges, and that the trial judge therefore erred in declining defense counsel's invitation for an aggravated manslaughter charge and sua sponte in failing to charge as to passion/provocation manslaughter. Under New Jersey state law, a trial court 'shall not charge the jury with respect to an included offense unless there is a rational basis' to convict a defendant of [that] lesser included offense." *State v. Savage*, 799 A.2d 477, 491 (N.J. 2002) (quoting N.J. Stat. Ann. § 2C:1-8(e)). Both aggravated manslaughter and passion/provocation manslaughter are lesser included charges for murder under New Jersey law. While a murder conviction in New Jersey requires proof that a defendant caused the victim's death or serious bodily injury which resulted in death and that the defendant did so purposely or knowingly, *see* N.J. Stat. Ann. § 2C:11-3(a)(1) and (2), aggravated manslaughter instead requires a showing that the defendant caused the death or serious injury resulting in death of the victim "recklessly . . . under circumstances manifesting extreme indifference to human life." N.J. Stat. Ann. § 2C:11-4(a)(1). Passion-provocation manslaughter in turn has the following elements: "(1) reasonable and adequate provocation; (2) no cooling-off time in the period between the provocation and the slaying; (3) a defendant who actually was impassioned by the provocation; and (4) a defendant who did not cool off before the slaying." *State v. Josephs*, 803 A.2d 1074, 1109 (N.J. 2002). Generally, "words alone, no matter how offensive or insulting, do not constitute [sufficient] provocation." *State v. Crisantos*, 508 A.2d 167, 171 (N.J. 1986).

The trial court in this matter declined to charge aggravated manslaughter because the facts of this case, summarized above, contained no rational basis for a finding of recklessness in light

of the fact that the victim was shot three times from behind and the evidence strongly indicated that Petitioner had intended to kill the victim, and there was nothing more than speculation that any recklessness may have been involved. The Appellate Division affirmed for largely the same reason – there was strong evidence of purposeful or knowing action, and naught but speculation as to any recklessness. (Document 7 attached to ECF No. 14 at 13-14). Petitioner has not shown that these conclusions were in any way contrary to Supreme Court case law, and this Court firmly agrees with the state courts that the record does not have any rational basis for a finding of recklessness. Petitioner has thus failed to show that the denial of an aggravated manslaughter charge was in any way an unreasonable application of or contrary to Supreme Court caselaw, and has likewise failed to show that the state courts misconstrued any facts, nor has Petitioner shown that his trial was fundamentally unfair as a result of the refusal to charge aggravated manslaughter. Petitioner is therefore not entitled to habeas relief on this basis.

Petitioner's passion/provocation argument is similarly without merit. As explained to Petitioner by the Appellate Division, the victim's alleged threats to beat Petitioner is patently insufficient to warrant a passion/provocation charge as words alone cannot form the basis for provocation. (Document 7 attached to ECF No. 14 at 16). Likewise, the record of Petitioner's trial did not provide a basis for finding that Petitioner lacked time to cool off, and for that reason there also was no rational basis for a passion/provocation charge. (*Id.*). The denial of such a charge thus did not render Petitioner's trial fundamentally unfair, and Petitioner has failed to show that the rejection of such a charge by the Appellate Division was either contrary to or an unreasonable application of federal law or the facts. Petitioner's passion/provocation claim thus fails to present a valid basis for relief.

In his final jury charge claim, Petitioner contends that the charge given to the jury on prior inconsistent statements of witnesses was flawed as it varied from the model charge for that issue in New Jersey. The Appellate Division rejected this claim, finding that the judge's charge "essentially tracked the Model Jury Charge," adequately informed the jury that they should "carefully consider all the circumstances under which the prior statement was given[] including 'such factors as where and when the prior statement or omission occurred and the reasons, if any therefor,'" and because the prior inconsistent statements in question were essentially harmless even were the charge flawed given the compelling evidence of Petitioner's guilt including his own admissions to having committed murder and specifically the Mravlag Manor killing. (*Id.* at 18-23). Having reviewed the jury charge in its entirety and the inconsistent statement charge specifically, (*see id.* at 18-21), this Court agrees – the charge given adequately informed the jury of how to interpret and determine credibility in light of inconsistent statements, and in any event was patently incapable of rendering Petitioner's trial fundamentally unfair in light of the compelling evidence of Petitioner's guilt. Because Petitioner has not otherwise shown that the Appellate Division's decision was contrary to or an unreasonable application of federal law or the facts, Petitioner is not entitled to habeas relief on any of his jury instruction claims.

**2. Petitioner's sufficiency of the evidence charge**

Petitioner next argues that the evidence presented at trial was insufficient to support a conviction for purposeful or knowing murder. When a petitioner presents a claim challenging the sufficiency of the evidence provided at trial, "a reviewing court must ask 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Eley*, 712 F.3d at 847

(quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A court sitting in habeas review may therefore overturn a conviction based on insufficient evidence only "if it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* (quoting *Jackson*, 443 U.S. at 324). "Under *Jackson*, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman v. Johnson*, 566 U.S. 650, 655 (2012). Under this "deferential federal standard," juries have "broad discretion in deciding what inferences to draw from the evidence presented at trial" and federal courts must not "unduly impinge[] on the jury's role as factfinder" by engaging in "fine-grained factual parsing." *Id.* So long as a rational fact finder could find all of the elements of the charged offense beyond a reasonable doubt when viewing the facts in the light most favorable to the State and giving the State the benefit of all reasonable inferences, a sufficiency of the evidence habeas claim fails.

The Appellate Division rejected Petitioner's sufficiency of the evidence claim as patently meritless, finding that the evidence of Petitioner's guilt was "compelling." Having reviewed the record of this matter, this Court agrees. The evidence presented places Petitioner at the scene of the shooting, places a gun in his hand through Petitioner's statements to others, and includes testimony including Petitioner's admissions to friends and family indicating that Petitioner admitted to having committed murder and specifically the shooting at Mravlag Manor. Given this evidence, it is entirely clear that a rational fact finder could find all of the elements of murder – the purposeful or knowing killing of another – beyond a reasonable doubt. Petitioner's sufficiency of the evidence claim therefore fails and provides no basis for habeas relief. *Eley*, 712 F.3d at 847.

### 3. Petitioner's ineffective assistance of counsel claims

In his final two claims, Petitioner contends that his trial counsel proved constitutionally ineffective by falling asleep during the State's summation and in failing to investigate and interview numerous witnesses and potential witnesses. The standard applicable to such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.
>
> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.
>
> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable

probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

Turning first to Petitioner's trial preparation claim, Petitioner has utterly failed to provide any allegations, either in this Court or before the PCR court, let alone proof, of what evidence or testimony would have been produced had counsel conducted the further interviews and investigations Petitioner believes were warranted, and the state courts rejected this claim on this basis. As this Court has explained,

[i]n *Strickland*, the Supreme Court held that trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 691. "The failure to investigate a critical source of potentially exculpatory evidence may present a case of constitutionally defective representation," and "the failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness." *United States v. Travillion*, 759 F.3d 281, 293 n. 23 (3d Cir. 2014) (internal quotations omitted); *see also United States v Gray*, 878 F.2d 702, 711 (3d Cir. 1989) (noting that a complete absence of investigation usually amounts to ineffective assistance because a counsel cannot be said to have made an informed, strategic decision not to investigate); *United States v. Baynes*, 622 F.2d 66, 69 (3d Cir. 1980).

> Where a Petitioner can show that counsel's failure to investigate amounts to deficient performance, he must still show prejudice. In order to do so,
>
>> a defendant basing an inadequate assistance claim on his or her counsel's failure to investigate must make "a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained from such an investigation and whether such information, assuming admissibility in court, would have produced a different result.
>
> *United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996) (quoting *Sullivan v. Fairman*, 819 F.2d 1382, 1392 (7th Cir. 1987)); *see also United States v. Lathrop*, 634 F.3d 931, 939 (7th Cir. 2011) ("[w]hen a petitioner alleges that counsel's failure to investigate resulted in ineffective assistance, the petitioner has the burden of providing the court with specific information as to what the investigation would have produced"); *United States v. Green*, 882 F.2d 999, 1002 (5th Cir. 1989) ("A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome" of Petitioner's case); *accord Untied States v. Garvin*, 270 F. App'x 141, 144 (3d Cir. 2008).

*Brown v. United States*, No. 13-2552, 2016 WL 1732377, at *4-5 (D.N.J. May 2, 2016).

Although Petitioner contends in his habeas petition that counsel should have conducted further investigation and should have interviewed several witnesses and potential witnesses, he has utterly failed to allege, let alone show, what evidence or trial testimony would have produced had counsel done has Petitioner now requests. As Petitioner has therefore failed to provide a comprehensive showing of what evidence or testimony would have resulted, he has failed as a matter of law to show *Strickland* prejudice, and his claim of ineffective assistance of counsel based on pre-trial investigation is utterly without merit and provides no basis for habeas relief. *Askew*, 88 F.3d at 1073; *Garvin*, 270 F. App'x at 144; *Brown*, 2016 WL 1732377 at *4-5.

In his final claim, Petitioner argues that his trial counsel proved constitutionally ineffective because he fell asleep during summation. Although he explicitly argues the point in his amended habeas petition, Petitioner also argued in the state courts that counsel *may* have been asleep at other times during trial, but provided no allegations or evidence suggesting that counsel fell asleep or had difficulty remaining awake during any portion of his trial other than during the state's summation. The PCR court summarized the background of this claim as follows:

> Here, although trial counsel fell asleep during a portion of the prosecutor's closing argument, the Court ordered trial counsel to listen to a playback of the prosecutor's closing argument outside the presence of the jury so that he could raise any objections the defense had. Trial counsel then listened to the playback of the prosecutor's closing statement and raised any objections he had for the record.
>
> The Court also interviewed each juror individually, asking if anything caught their attention during the prosecutor's summation. If a juror mentioned that they had seen defense counsel asleep or that they saw [Petitioner] pass a note [to trial court staff raising counsel's sleeping during summation], the Court asked the juror if such would interfere with his or her ability to be fair and impartial or decide the case on its merits. Nine out of sixteen jurors indicated they saw [either defense counsel sleeping or Petitioner writing his note] during summation; one indicated he [also] saw counsel sleeping during the State's opening statement. Each juror indicated that they could remain fair and impartial and decide the case on its merits. The Court also instructed the jurors that what they saw should not play any part in their deliberations, nor should they discuss what they saw with other jurors.

(Document 15 attached to ECF No. 14 at 17-18, record citations omitted). Petitioner argued that counsel's falling asleep during summation and possibly at other times either established ineffective assistance of counsel under *Strickland* or entitled him to a presumption of prejudice and a new trial regardless under *United States v. Cronic*, 466 U.S. 648 (1984), and its progeny. The PCR court rejected both arguments, finding *Cronic* inapplicable under the circumstances and finding that Petitioner had failed to show *Strickland* prejudice in light of the evidence of Petitioner's guilt and

13

the corrective actions taken by the trial Court. (Document 15 attached to ECF No. 14 at 18). The Appellate Division affirmed on the same basis. (Document 21 attached to ECF No. 14).

Initially, the Court finds that the PCR court's decision not to apply *Cronic* in this matter was neither contrary to nor an unreasonable application of clearly established federal law. As one panel of the Third Circuit has explained,

> In *Cronic*, the Supreme Court held that Sixth Amendment violation of the right to counsel may be found without showing prejudice where "circumstances [exist] that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U.S. at 658[.] For example, automatic reversal is required where there has been a complete denial of counsel at a critical stage of the criminal proceedings. *Id.* at 659[.] The Supreme Court has clarified that the phrase "critical stage" denotes "a step of a criminal proceeding, such as arraignment, that h[olds] significant consequences for the accused." *Bell v. Cone*, 535 U.S. 685, 696 [] (2002). [The Third Circuit has] narrowly construed *Cronic* to "prescribe[] a presumption of prejudice only with regard to those critical stages of litigation where a denial of counsel would necessarily undermine the reliability of the entire criminal proceeding." *Ditch v. Grace*, 479 F.3d 249, 255 (3d Cir. 2007).

*Smith v. Kerestes*, 414 F. App'x 509, 511 (3d Cir. 2011).

Although neither the Supreme Court nor the Third Circuit have addressed whether *Cronic* applies in cases where counsel falls asleep during trial, the Third Circuit has in one instance noted that other circuits have "presume[ed] prejudice when defense counsel slept through a *substantial portion of trial*, suspending the adversarial nature of the process." *Appel v. Horn*, 250 F.3d 203, 215 (3d Cir. 2001) (emphasis added, citing *Tippins v. Walker*, 77 F.3d 682, 686-87 (2d Cir. 1996)). All of the circuit courts to have addressed the question, however, have declined to find counsel falling asleep requires a *per se* application of *Cronic*, and have instead held that the presumption of prejudice applies only where counsel slept through a substantial portion of trial or during a critical portion of trial depriving the petitioner of the necessary aid of counsel during that critical

14

juncture.  *See United States v. Ragin*, 820 F.3d 609, 619, 619 n. 3 (4th Cir. 2016); *Muniz v. Smith*, 647 F.3d 619, 625-26 (6th Cir. 2011); *Burdine v. Johnson*, 262 F.3d 336, 341 (5th Cir. 2001); *Tippins*, 77 F.3d at 686-87; *Javor v. United States* 724 F.2d 831, 834 (9th Cir. 1984).  All of these Circuit courts, as well as those District Courts to have addressed the issue in this Circuit, have required at the very least that counsel sleep through a critical juncture at trial or sleep through substantial portions of trial to warrant application of a presumption of prejudice.  *Ragin*, 820 F.3d at 619; *see also United States v. Massimino*, 389 F.Supp. 3d 357, 373 (E.D. Pa. 2019).

As this Court agrees with the approach taken by these courts, this Court finds that *Cronic* is inapplicable in this case.  Although counsel slept through portions of the state's summation and at least one juror thought he may have been asleep during part of the State's opening, the trial court in this matter directly ordered counsel to listen to the summation afterwards out of the jury's presence and provide any objections he may have, and the jurors all testified that their observation of counsel's sleeping would not affect their ability to act fairly and impartially.  There is no evidence that counsel slept through a substantial portion of Petitioner's trial, nor is there any evidence that counsel's sleeping denied Petitioner his right to counsel during any critical stage in light of the trial court providing counsel with a second opportunity to object to any issues in the summation he may have slept through.  The *Cronic* presumption therefore does not apply and Petitioner may only establish his entitlement to relief by showing his prejudice.  Even if this Court thought otherwise, the PCR court could not have misapplied or unreasonably applied clearly established federal law by declining to apply *Cronic* here as the Supreme Court has not held that the *Cronic* presumption of prejudice applies where counsel falls asleep during portions of trial and has otherwise strictly and narrowly construed *Cronic*.  There is therefore no clearly established

federal law requiring state courts to apply *Cronic* under the circumstances presented here. *See, e.g., Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008).

Turning to *Strickland*, this Court finds that Petitioner has utterly failed to show how he was prejudiced by counsel's inability to remain awake during the State's summation. Clearly, any prejudice suffered by a lack of counsel's ability to object or otherwise move to strike portions of the State's summation was alleviated when the Court ordered counsel to listen to a recording of the summation and then permitted counsel to raise any relevant objections. Likewise, to the extent Petitioner believes that the jury was somehow prejudiced by this issue, the trial court interviewed each juror and each specifically told the court that their impartiality and fairness would not be affected by viewing counsel during the State's summation. Likewise, that the court gave a curative instruction further directing jurors not to discuss or consider the issue in any way during deliberations further purged any negative effect on Petitioner's trial. In light of these curative actions, and in light of the extremely compelling evidence of Petitioner's guilt, it is clear that Petitioner was not prejudiced by counsel's sleeping during a portion of the State's summation in this case. Petitioner has thus failed to demonstrate ineffective assistance of counsel, nor has he shown that the PCR court unreasonably applied clearly established federal law or the facts of his case. Petitioner's final claim is therefore without merit and his amended habeas petition is denied.

### III. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of a state court proceeding unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution

of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). As Petitioner's claims are without merit for the reasons discussed above, Petitioner has failed to make a substantial showing of the denial of a constitutional right and he is denied a certificate of appealability.

## IV. CONCLUSION

For the reasons set forth above, Petitioner's amended habeas petition (ECF No. 6) is DENIED, and Petitioner is DENIED a certificate of appealability. An appropriate order follows.


Dated: January 27, 2020                    *s/ Susan D. Wigenton*
                                           Hon. Susan D. Wigenton,
                                           United States District Judge